OLIVER W. BIRCKHEAD, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 72389.   Promulgated November 14, 1935.

*Allen G. Gartner, Esq.*, for the petitioner.
*O. W. Swecker, Esq.*, for the respondent.

OPINION.

SMITH: This is a proceeding for the redetermination of a deficiency in income tax for 1930 of $2,422.25. The petition alleges that the respondent erred in his determination of the deficiency in the disallowance of a deduction from gross income of a loss of $15,861.40

on an investment in a pool organized in 1929 for the purpose of dealing in the common shares of the American Seating Co.

During 1926 the petitioner became the president of the Murray Hill Trust Co. of New York, in which capacity he met Frederic L. Yeagel, who was also a director of the trust company and a partner of Sutro & Co., stockbrokers.

Under date of September 30, 1929, Yeagel wrote to the petitioner inviting him to participate in a syndicate stock pool being organized and managed by him for the purpose of trading in the stock of the American Seating Co. Attached to the letter was a syndicate agreement which reads as follows:

I have been requested to form, and am forming, an account of which I am to be the Manager, and in which I may participate as a member, to trade in the Common stock of American Seating Co.

The Syndicate will trade in the shares of said stock and no other security. The commitment of the Syndicate shall not at any one time exceed 50,000 shares, either short or long, of said stock; and all transactions for the account of the Syndicate shall be in accordance with and subject to the rules and regulations of the New York Stock Exchange. Subject only to the limitations aforesaid, the Manager in a trading account, on books duly kept entitled "American Seating Co. Stock Account", shall have full power and authority hereby granted in his uncontrolled judgment and discretion, during the life and for the account of the Syndicate, to buy and sell and generally trade in the shares of the .Common Stock above mentioned, either long or short, and at either public or private sale, and to deal in puts and calls thereon.

I am reserving for you a participation of 2,000 shares in the Syndicate, subject to delivery to me of your acceptance in the form indicated below, not later than noon on October 5, 1929.

The profits and losses of the Syndicate shall be divided among and borne by the participants in the proportion which their respective participations bear to 50,000. The participants shall be deemed to participate in each transaction in proportion to their several interests in the Syndicate. Any loss resulting from the failure of any participant to carry out his obligations hereunder shall not be charged as a loss to the Syndicate, but in respect of any such loss incurred or threatened, resulting from such failure, the Manager shall have full power and authority hereby granted to take such action, by sale or otherwise and with or without notice, as in his uncontrolled discretion is necessary, to protect the Manager against loss.

The Syndicate will expire at the close of business on December 1, 1929 unless sooner terminated by the Manager, and may be extended at the discretion of the Manager for two additional periods of three months each, or any part thereof.

The Manager may from time to time and upon two days' notice, call, and the participants shall thereupon pay in cash, such amounts on account of the Syndicate liability whether for purchase price, margin or otherwise, as the Manager may deem proper, provided the Manager shall not require the participants to maintain a margin in excess of 35% of the entire Syndicate liability.

Interest and commissions shall be paid to the Manager and charged to the Syndicate, as in any trading account, under the rules of the New York Stock Exchange, and the Manager may be interested in the Syndicate as a participant

subject to the same liability as any other participant and the same rights of profit or otherwise; and in addition thereto, as additional compensation for services as Manager of the account, shall be entitled to receive 10% of the Syndicate profits, if any, at the termination of the Syndicate. All expenses incidental to the operation of the Syndicate, including legal expenses, advertising, printing, postage, and all clearance charges, floor charges, and commissions, payable by the Manager to other brokers, or for transactions conducted by the house of the Manager, shall be a charge upon and paid by the Syndicate.

The Manager shall have full discretionary power and authority hereby granted to borrow money for the Syndicate, for any of the purposes covered by this agreement, and to pledge as security therefor any of the Syndicate assets in their general loans maintained by the house of the Manager without regard to the Syndicate indebtedness of the participants to the Manager; and also to pledge as security therefor this Agreement and the several obligations of the participants hereunder.

The Manager may in his sole discretion release any participant for any cause, and substitute another satisfactory to the Manager, providing the said substitute assumes the obligations of the released participant. In case of any default on the part of any participant, his interest in the Syndicate, or any shares which he may be required to take up, may be sold at public or private sale, with or without notice, and the Manager or any participant or participants may be the purchaser or purchasers, notwithstanding which every such defaulting participant shall be responsible to the extent of his full liability hereunder. The Manager may in his sole discretion make any such adjustment with any participant as the Manager deems proper. No participant shall in any manner be relieved of his obligations hereunder, by default of any other participant, nor shall his obligations be in any manner increased thereby.

Any participant, with the consent of the Manager, may take up and carry his ratable share of the Syndicate stock, and upon payment therefor shall be relieved of any further liability on the Syndicate account; provided such participant shall agree with the Manager that the stock so taken up shall not be sold during the life of the Syndicate, without consent of the Manager in writing first obtained and that the same shall be held during the life of the Syndicate, subject to the call of the Manager; and upon such withdrawal, the limit of commitment in the trading account shall be correspondingly reduced and the proportionate interest of the remaining participants shall be ratably increased.

Upon the termination of the Syndicate, the Manager shall account to the participants upon the assets remaining in the Syndicate account, distributing to the participants against payment, their respective proportions of any shares of stock then in the hands of the Manager for account of the Syndicate, together in their respective proportions of any cash on hand; and in the event of a loss, a statement of their respective proportions thereof, which the participants shall forthwith pay to the Manager. Apportionment and distribution by the Manager of profits and losses and expenses shall be conclusive upon the Syndicate and upon the participants, as shall also be the written statements of the Manager of the result of the Syndicate operations. The Manager shall not be liable under any of the provisions of this agreement or for any other matter connected herewith, or for the exercise of his judgment and discretion in the management of the Syndicate except for want of good faith.

Nothing herein contained shall constitute the participants partners with the Manager or with one another, or render them liable for more than their proportionate shares, respectively, of the entire Syndicate liability.

Nothing contained in this agreement shall be construed as creating any trust or obligation in favor of any person or corporation other than the parties

hereto, nor any obligations in their favor otherwise than as herein expressly provided.

The agreement shall extend to and bind the successors and personal representatives of the respective parties. This agreement is entered into and is to be performed in the State of New York, and shall be construed in accordance with the laws of said State.

Any notice from the Manager to any participant shall be deemed to have been duly given if mailed or telegraphed to such participant at the address furnished to the Manager by such participant.

Please confirm your acceptance of your participation under the terms stated above, by signing upon the enclosed duplicate hereof the form of acceptance set forth below, returning the same to the Manager.

The petitioner accepted the invitation and put up $10,000 upon an allotment of 2,000 shares. A month or so later, when the stock declined in value, the petitioner was asked to pay and did pay $6,000 more to the syndicate, making his total cash commitment in the syndicate $16,000.

During the latter part of 1929 and 1930 the market value of the stock continued to decline and the petitioner being, mindful and concerned over his inevitable loss in the investment, requested Yeagel, the syndicate manager, " to take me out of the position that I could not in any way live up to."

The syndicate agreement expired by limitation on June 1, 1930, whereupon Yeagel, without petitioner's knowledge or consent, charged the petitioner, in an account on the books of Sutro & Co. entitled "American Seating Co. stock account No. 2 ", with 2,000 shares of syndicate stock, comprising the petitioner's investment in the syndicate. A transcript of such account shows the petitioner charged with $48,000 on account of his participation in the pool, and credited with 2,000 shares American Seating Co. stock. Until about 1934, the petitioner received monthly statements from Sutro & Co. showing that he was still charged with this debt of $48,000, but no demand has ever been made upon him for the payment of the debt.

At the time the syndicate was dissolved, the market price of American Seating Co. common stock was $10 per share. Subsequently the stock sold down to 50 cents per share, and at the time of this hearing in 1934 the market price was approximately $3 per share.

On his income tax return for 1930 petitioner claimed the deduction of a loss of $16,000 representing his contribution to the syndicate. Upon the audit of the return by the respondent the petitioner was allowed the deduction of $138.60 of this amount. The balance of $15,861.40 was disallowed. In his deficiency notice upon which this proceeding is predicated the respondent advised the petitioner:

\* \* \* The stock was purchased by the syndicate at about $32.00 per share, making a total of $64,000.00 for which you were obligated. Having put up $16,000.00 as collateral, there remained a balance due by you of $48,000.00.

The pool was not successful and early in 1930 the pool manager called upon the participants to take up their stock and pay the balance due thereon. The 2,000 shares contracted for by you were transferred to your trading account on the books of the broker and are still held on your account as "long" 2,000 shares of American Seating Company stock. As the account with the broker was still open in 1930 and you were still the owner of the stock there was no completed transaction in 1930. * * *

Section 23 of the Revenue Act of 1928 provides that in computing net income there shall be allowed as deductions:

(e) *Losses by individuals.*—In the case of an individual losses sustained during the taxable year and not compensated for by insurance or otherwise—

(1) if incurred in any transaction entered into for profit though not connected with the trade or business; * * *

As we understand the respondent's position, it is that the loss claimed by the petitioner is not evidenced by a closed and completed transaction. No contention is made by the respondent that the investment of $16,000 was not incurred in a transaction entered into for profit within the meaning of the statute, and in the light of the evidence we think that no such contention could be made. The respondent cites in support of his contention article 171 of Regulations 74, which provides that "Losses must usually be evidenced by closed and completed transactions."

We note that the syndicate agreement evidenced a clear intent on the part of the participants to vest in the syndicate manager independent powers or control of the assets of the syndicate and in the management of the syndicate's affairs. During the continuance of the syndicate, profits or losses sustained upon purchases and sales of stock by the syndicate were the profits and losses of the syndicate and not of the participants. Cf. *J. D. Bigger*, 19 B. T. A. 797; *W. R. Hervey*, 25 B. T. A. 1282. The syndicate was dissolved on or about June 1, 1930. Upon dissolution the petitioner was charged with owning 2,000 shares of American Seating Co. stock which had a then market value of $20,000 and with debts of $48,000. If the petitioner had received upon dissolution of the syndicate cash and property of a value in excess of his contribution to the pool he would have been taxable upon the profit. *Wild* v. *Commissioner*, 62 Fed. (2d) 777; *Glenmore Securities Corporation* v. *Commissioner*, 62 Fed. (2d) 780; certiorari denied, 289 U. S. 754; *William S. Gordon, Trustee*, 33 B. T. A. 460. If the amount that he received from the dissolution of the pool had a value less than his contribution to the pool he would be entitled to deduct a loss. If the petitioner had been able to respond to the request of the syndicate manager and had paid the additional amount of $48,000 he would have received upon the dissolution of the pool on June 1, 1930, for his investment of $64,000 in the pool, shares of stock having a

value of only $20,000. We think it can not be questioned that his loss in such case would have been the difference between $64,000 and $20,000, or $44,000.

But the evidence indicates that the petitioner was not able to respond to the request of the syndicate manager for an additional contribution of $48,000. His actual contribution to the pool was $16,000. The year of deductibility of a loss is determinable by a practical test. *Lucas* v. *American Code Co.*, 280 U. S. 445; *Francis S. Appleby*, 31 B. T. A. 533. Applying such test to the facts which obtain in the instant proceeding, we have no question but that the petitioner sustained a deductible loss in the year 1930 of $16,000.

Reviewed by the Board.

*Judgment will be entered under Rule 50.*